**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **KUANTAY REEDER**, | **CIVIL ACTION NO.** |
| Plaintiff | **SECTION** |
| v. | **JUDGE** |
| **JASON WILLIAMS, IN HIS OFFICIAL CAPACITY, and ABC INSURANCE COMPANIES 1-10**, | **MAGISTRATE** |
| Defendants. | **JURY TRIAL DEMAND** |

## <u>COMPLAINT</u>

## TABLE OF CONTENTS

INTRODUCTION                                                                 3

JURISDICTION AND VENUE                                                       5

PARTIES                                                                      5

FACTUAL ALLEGATIONS                                                          6

CAUSES OF ACTION                                                            38

   FIRST CAUSE OF ACTION – 42 U.S.C. § 1983                   38

   SECOND CAUSE OF ACTION — LOUISIANA REVISED STATUTE § 22:1269   40

PRAYER FOR RELIEF                                                           41

## INTRODUCTION

1.     Kuantay Reeder ("Reeder" or "Mr. Reeder") was wrongfully convicted and served over twenty-eight (28) years in prison for a crime he did not commit, as a result of repeated violations of his constitutional rights by the Orleans Parish District Attorney's Office ("OPDA"). Specifically, OPDA suppressed information that demonstrated not only Mr. Reeder's innocence, but also another man's guilt—all in violation of OPDA's obligations under *Brady v. Maryland* and its progeny.

2.     Mr. Reeder was arrested in August of 1993 in connection with the April 1993 murder of Mark Broxton outside a convenient store in Algiers. OPDA prosecuted Mr. Reeder for Broxton's murder, while suppressing information showing that Mr. Reeder was not the murderer, and that, in fact, another individual was the actual murderer.

3.     Specifically, OPDA suppressed information establishing and/or confirming (1) that the prosecution's sole-testifying eyewitness told prosecutors, on at least two separate occasions, that he actually identified the alternative suspect – not Mr. Reeder – as being the shooter; (2) that the prosecution's sole-testifying eyewitness told prosecutors that he had never seen Kuantay Reeder before the shooting, despite testifying at trial that he recognized Kuantay Reeder from seeing him before the shooting; (3) that the prosecution's sole-testifying eyewitness had prior federal convictions for lying on a firearms application and being a felon in possession of a firearm; and (4) that Broxton's mother originally believed the alternate suspect was the murderer because the alternate suspect had her phone number and on the night of the murder she received an anonymous voicemail from a male, saying "tonight I killed that dog."

4.     This favorable evidence was, in all respects, material to Mr. Reeder's defense. The evidence – if disclosed – would have completely undermined the case against Mr. Reeder. Had the ADA's fulfilled their constitutional and ethical obligations, Mr. Reeder would never have been wrongfully convicted and unlawfully held for over twenty-eight (28) years.

5.     After nearly three decades, the prosecutorial misconduct that led to Mr. Reeder's conduct came to light once the OPDA's Civil Rights Division reviewed the prosecution's original case file. Mr. Reeder filed a Supplement to his Application for Post-Conviction Relief. OPDA stipulated that prosecutors violated their *Brady* obligations by withholding favorable information from Mr. Reeder, and that the withholding of such information rendered the jury's verdict unworthy of confidence. The District Court vacated Mr. Reeder's convictions and OPDA dropped the charges against him on December 6, 2021. At the conclusion of the proceedings, the District Court addressed Mr. Reeder:

> "So I just – just want to say, Mr. Reeder, on behalf of the Court and to the Broxton family, again, it is this Court's sincerest apologies that this happened to both of you all: Mr. Reeder, being wrongfully convicted and serving, you know, several years of your life in prison for a crime that you did not commit…"

6.     As a direct and proximate result of Defendants' conduct, Mr. Reeder has suffered injuries and damages, including: pain and suffering, severe mental anguish, emotional distress, lost income, physical illness, inadequate medical care, humiliation, injury to reputation, permanent psychological damage, and restriction of all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, family relations, travel,

enjoyment, and expression. Many of these injuries and harms continue even after Mr. Reeder's release from prison.

7.      Mr. Reeder now seeks to hold accountable those responsible for depriving him of his freedom for more than one-half of his life.


## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over Mr. Reeder's 42 U.S.C. § 1983 claim pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

9.      This Court has subject matter jurisdiction over Mr. Reeder's state-law claim pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b).


## PARTIES

11.     Plaintiff Kuantay Reeder ("Kuantay Reeder" or "Mr. Reeder") is a 50-year-old Louisiana resident who lives in Slidell, which is within the Eastern District of Louisiana.

12.     Defendant Jason Williams ("Williams"), whom Mr. Reeder sues in his official capacity only, is the Orleans Parish District Attorney and head of the Orleans Parish District Attorney's Office ("OPDA"), a local government agency located in the Parish of Orleans, State of Louisiana.

13.     Defendants ABC Insurance Companies 1-10 are as-yet unknown insurance companies who may have issued and currently have in effect one or more policies of

insurance covering Defendant Williams and OPDA and/or the actions complained of herein.

## FACTUAL ALLEGATIONS

### I.   THE MURDER OF MARK BROXTON

14.      At approximately 6:55 p.m. on Tuesday, April 13, 1993, Mark Broxton was using a payphone outside of Julien's Grocery, located at the corner of General De Gaulle Drive and Whitney Avenue, in Algiers.[1] While Broxton was on the phone, an individual approached Broxton and shot him four times. Broxton walked into Julien's Grocery, asked the cashier to call for help, and collapsed to the ground.

15.      NOPD Officers McWilliams and Delery arrived on the scene and were directed into Julien's Grocery, where they encountered Broxton, still-conscious, lying on the ground next to the register. When asked who shot him and why, Broxton responded that he did not know who shot him or why. Broxton was subsequently transported to the Medical Center of Louisiana, where he died during surgery later that evening.

16.      At the scene of the shooting, Officers McWilliams and Delery interviewed three eyewitnesses: (1) Ella Fletcher – an eyewitness to the shooting; (2) Earl Price – an eyewitness to the shooting; and (3) Ali Kadhim – the cashier at Julien's Grocery during the shooting.

17.      Ali Kadhim stated that he was working the register when he heard multiple gunshots. He then observed Broxton run into the store and state "I've been shot, call the police" before falling to the floor.

---

[1] The roads have since been renamed and the intersection is presently that of Burmaster Street and L.B. Landry Avenue.

[2] As detailed further below, at the time, the alternate suspect, Berzeracque "Byrd" Johnson was

6

18.     Ella Fletcher stated she heard multiple gun shots and then observed a Black male, wearing a dark multi-colored jacket, fleeing from Whitney Avenue across General De Gaulle Drive. She further stated the individual removed the dark multi-colored jacket and threw it in or at a dumpster.

19.     Earl Price stated he heard the gunshots and observed a Black male, wearing a black, blue, and purple jacket, running from Whitney Avenue across General De Gaulle Drive. Price further stated he observed the individual remove the multi-colored jacket and throw it near the dumpster. Price would later describe the shooter as being approximately 6'1" tall and weighing between 150 and 160 pounds.[2]

20.     NOPD Officers subsequently located and searched the nearby dumpster and located a multi-colored black, blue, and purple jacket. Eyewitnesses confirmed this was the same jacket they saw the shooter wearing. Inside a front pocket of the jacket, NOPD officers discovered a postage stamp bearing a partial print.

21.     In addition to the jacket and stamp, NOPD crime scene technicians also recovered five (5) spent casings and one (1) pellet fired from a .380 caliber gun. No other physical evidence was collected from the scene of the shooting.

22.     None of the physical evidence inculpated Kuantay Reeder in the shooting. To the contrary, a more recent forensic analysis of the fingerprint actually exculpated Mr. Reeder. In 2021, NOPD's crime lab analyzed the latent print found on the stamp. The test results excluded Kuantay Reeder as being a possible source of the print.

---

[2] As detailed further below, at the time, the alternate suspect, Berzeracque "Byrd" Johnson was listed at 6'1" and weighing 147 lbs. Kuantay Reeder was listed at 6'1" with a "muscular" build, weighing 220 lbs. – over fifty pounds more than the described shooter.

23.     Three days after the murder, NOPD Homicide Detective Wesley Morris inherited the case and began his investigation – an investigation OPDA's Civil Rights Division later described as "not particularly thorough or strategic."

**Development of Suspects: Berzeracque "Byrd" Johnson and Kuantay Reeder**

24.     Detective Morris began his investigation by interviewing three individuals who were close to Broxton: Mary Menina, Broxton's mother; Lillian Lipscomb, Broxton's romantic partner; and Krischon Smith, Broxton's romantic partner.

25.     During these interviews, Detective Morris learned that "word in the project" implicated two individuals as a potential shooter: Kuantay Reeder and Berzeracque "Byrd" Johnson. As detailed below, however, all the circumstantial evidence pointed to Byrd Johnson.

26.     Krischon Smith – the mother of Berzeracque Johnson's child, who was romantically involved with Broxton – informed Detective Morris that approximately one month before Broxton's murder, she received a telephone call from Berzeracque "Byrd" Johnson, who was in jail at the time. During the phone conversation, Berzeracque "Byrd" Johnson heard Broxton's voice in the background at Smith's house. After making Smith identify the male individual (Broxton), Berzeracque "Byrd" Johnson told Smith that Broxton "ain't (sic) gonna (sic) get away with that" and that he would "make [Broxton] pay."

27.     Approximately one month later, Berzeracque "Byrd" Johnson was released from jail. On the night of his release, Johnson attempted to call Krischon Smith at her house three separate times, but Smith was not at home. Less than 24-hours later, Mark Broxton was murdered.

28.    Approximately ten minutes after Broxton's murder, Berzeracque "Byrd" Johnson called Smith and informed her that "her friend" had been shot. Johnson later described, in accurate detail, how the shooting occurred, where it occurred, how many times Broxton was shot, and where he was shot. When Smith asked Johnson how he was feeling after the shooting, Johnson responded, "the Bible said [sic] rejoice when somebody dies and cry when somebody is born."

29.    Also during his call with Smith, Johnson asked for Broxton's mother's phone number. That same evening, an unidentified male left the following message on Broxton's mother's answering machine: "I've killed that dog."

30.    Additionally, Lillian Lipscomb told Detective Morris that Berzeracque "Byrd" Johnson had previously shot at her – though no arrest or prosecution ever followed – and that Berzeracque "Byrd" Johnson "always carries" a gun. Krischon Smith confirmed that Johnson carried a gun.

31.    As to Kuantay Reeder, Krischon Smith indicated she had never seen him carrying a weapon.

32.    The evidence implicating Kuantay Reeder in Broxton's murder consisted solely of unfounded and discredited hearsay and gossip. Krischon Smith told Detective Morris that she had heard rumors the shooting was in retaliation for Mark Broxton drawing a gun on Kuantay Reeder three days before the shooting. However, Smith discounted these rumors, telling Detective Morris that she had been with Broxton on the night of that alleged encounter, and he did not have a gun. Smith also informed Detective Morris that she had never "seen Kuantay carry a weapon."

**Unduly Suggestive Photographic Line-up**

33.     Following the interviews with Menina, Lipscomb, and Smith, Detective Morris compiled a six-person photographic lineup, including photographs of both Berzeraque "Byrd" Johnson and Kuantay Reeder.

34.     The lineup was unduly suggestive. In the six-person lineup, the four "filler" individuals are depicted wearing shirts. Conversely, in their photographs, both Berzeracque "Byrd" Johnson and Kuantay Reeder are depicted wearing dark-colored hooded jackets – the same style jacket worn by Broxton's shooter. This was unduly suggestive in multiple respects. First, by depicting two of the six individuals in a unique manner, the lineup inappropriately drew the viewer's attention to these individuals, making it more likely the viewer would select one of the two individuals. Second, by depicting these two individuals wearing jackets similar to the one worn by the shooter, the lineup was unduly suggestive that one of these individuals was the shooter.

35.     The photographic lineup was further improper and unduly suggestive in that, upon information and belief, the photograph of Johnson inaccurately depicted his skin complexion as being lighter than his skin tone was in reality.

36.     On July 12, 1993 – nearly three months after the shooting – Detective Morris interviewed Earl Price, one of the three eyewitnesses interviewed at the scene the day of the shooting.

37.     During his interview with Detective Morris, Price provided a detailed account of the shooting and its aftermath that can best be described as incredible.

38.     Price stated that he witnessed the shooting from across General De Gaulle Drive –
a four-lane street separated by a median.  At trial, the defense established the distance
from Earl Price's vantage point to the actual shooting was over 50 yards. Despite the
distance and the presence of traffic, Price stated that he was able to hear the
conversation between Broxton and the shooter before the shooting occurred.

39.     Immediately following the shooting, Price claimed he crossed the street and
followed Broxton, who entered the nearby store "like nothing had happened." Price
further claimed that Broxton walked through the store, grabbed a cold drink from the
cooler, and walked to the counter to pay for the drink before finally collapsing.

40.     Price also provided a physical description of the shooter as a Black male with a
mustache, 22-23 years old, 6'1" tall, and weighing approximately 165-170 lbs. Price
would subsequently describe the shooter as weighing between 150 and 160 lbs.

41.     Price's physical description overwhelmingly matches that of Berzeracque "Byrd"
Johnson: a 22-year-old Black male with a mustache, standing 6'1" tall, and weighing
147 lbs. Conversely, at that time, Kuantay Reeder was a 20-year-old Black male with
a full goatee, standing 6'1" tall, with a "muscular build", and weighing 221 lbs – *i.e.*
between 51 to 71 lbs. heavier than Price's described shooter.

42.     At the end of the interview, Detective Morris presented Price with the flawed and
suggestive photographic lineup that included pictures of both Johnson and Kuantay
Reeder. According to Detective Morris's notes, Price selected the photograph of
Kuantay Reeder – something Price would later "adamant[ly]" refute.

43.     Immediately following Price's identification, Detective Morris prepared an arrest warrant for Kuantay Reeder. Mr. Reeder was arrested a month later and eventually, indicted for the second-degree murder of Mark Broxton.

**Trial and OPDA's Withholding of Information**

44.     Mr. Reeder pled not guilty to the murder and proceeded to trial on July 6, 1994. Mr. Reeder's first trial ended in a hung jury. The OPDA subsequently retried Mr. Reeder in July of 1995. At the conclusion of the second trial, a non-unanimous jury found Mr. Reeder guilty.

45.     In the absence of any physical evidence linking Mr. Reeder to Broxton's murder[3] the prosecution's trial strategy, at both trials, revolved around the testimony of its sole-testifying eyewitness – Earl Price.   At both trials, Price testified that he witnessed the shooting from across General De Gaulle, that he identified Kuantay Reeder in a photographic lineup as the shooter, and that he had previously seen Reeder around the Fischer Housing Development prior to the shooting.

46.     Conversely, the defense sought to discount Earl Price's testimony through the testimony of Osama Ali – the cashier at the food store during shooting – who directly contradicted Price's version of the events within the food store. Mr. Reeder also presented an alibi: at the exact moment of the shooting, he was playing basketball at LeBoeuf Court, over four blocks away from the scene of the shooting.

47.     Earl Price's credibility and the accuracy of his identification were central to the prosecution's case against Reeder, and the resulting conviction. During closing arguments, OPDA and the defense referenced Earl Price no fewer than 110 times.

---

[3] As detailed above, the only physical evidence of any significant value – the stamp recovered from the shooter's jacket – actually exculpated Mr. Reeder.

And during his closing argument, ADA Michael Daniels emphasized Price's testimony: "Earl Price, with everything you know, is a credible witness" – a markedly different opinion than the one Daniels expressed in an internal memoranda following the first trial, that ended in a hung jury: "[e]ach time Price tells his story, it changes."

48.     Before his trials, Mr. Reeder filed motions for discovery, requesting, in pertinent part: (1) "any and all information" contained within the prosecution's files that is "favorable to the defendant or exculpatory in any manner; all in accordance with Brady v. Maryland" ; (2) "evidence or information…that would tend to rebut or discredit evidence intended to be use [sic] by the prosecution"; and (3) "a copy of the criminal arrest and conviction records of each…witness" the prosecution intended to call at trial. Additionally, Mr. Reeder reminded the ADA's they were under a continuing duty to disclose such information.

49.     The ADA's written response disclosed no information whatsoever in response to these requests. To Mr. Reeder's request for exculpatory or favorable information, the ADA responded simply that it "is aware of its continuing duty under *Brady*." As to Mr. Reeder's requests for the arrest and conviction records of the prosecution's witnesses, the ADA's responded that Mr. Reeder was "not entitled" to such information.

50.     Shortly before trial prosecutors provided Mr. Reeder's counsel with a handwritten pleading, entitled "Response to Defense's Request for Rap Sheets of Victim and State Witnesses", signed by ADA Melanie Talia.  In the pleading, the prosecutors disclosed only four convictions for Earl Price: Assault and Battery in 1968 (Mississippi), Armed Robbery in 1975 (Mississippi), Felon with a Firearm in 1977 (Alabama), and

Burglary in 1982 (Mississippi). But ADA Talia withheld critical information detailing Earl Price's prior convictions in Mississippi for lying on a federal firearm application and for being a convicted felon in possession of a firearm. Additionally, ADA Talia withheld information that in July of 1993 – the same month Price gave his statement to Detective Morris –Price had been arrested, but ultimately not charged, for Simple Burglary and Possession of Stolen Things.

51.     More significantly, nearly three decades later, a review of the prosecution's file revealed that OPDA withheld significant, material evidence undermining Earl Price's credibility, along with the accuracy and believability of his purported identification of Mr. Reeder. Specifically, OPDA withheld information that, on at least two occasions, Price told prosecutors that he actually identified the photograph of the alternate suspect, Berzeracque "Byrd" Johnson, as the murderer – not Kuantay Reeder. And OPDA withheld information that Price told prosecutors he had actually never seen Kuantay Reeder before the shooting occurred. OPDA also withheld information that Price had previously been convicted of lying on a firearms application.

**Kuantay Reeder's Requests for *Brady* Material and OPDA's Legal Obligations**

52.     As detailed above, Reeder made multiple requests to OPDA, covering the very information that OPDA withheld. However, even without such requests, OPDA remained constitutionally obligated to disclose such information to Mr. Reeder.

53.     OPDA's obligation to disclose such information to Mr. Reeder has been detailed in a series of decisions by the United States Supreme Court, beginning with *Brady v. Maryland*, 373 U.S. 83 (1963), in which the Court held that, under the United States Constitution, the prosecution in a criminal case is required to disclose to the

defendant any information that is favorable to the defendant where such information is material to guilt or innocence. (This requirement will hereinafter be referred to as OPDA's "*Brady* obligations").

54.     Such favorable information includes (a) information that the defendant was not guilty of the crime charged; (b) information that another person, and not the defendant, committed the crime charged; (c) information that could be used to impeach the reliability, credibility, or (in any other respect) accuracy of a prosecution witness's testimony; (d) information that is in the possession of not only the prosecution but also the police or other law enforcement agencies that participated in the investigation or prosecution of the defendant; (e) favorable information – including, but not limited to, information of the types described in (a) through (d) above – that law enforcement authorities possess but is not documented.

55.     These requirements are fundamental aspects of our country's criminal justice system that all prosecutors are required and expected to be familiar with and follow. They have been promulgated and reiterated by the United States Supreme Court on several occasions since its decision in *Brady*, including in *Giglio v. United States*, 405 U.S. 150 (1972), *United States v. Agurs*, 427 U.S. 97 (1976); and in *Kyles v. Whitley*, 514 U.S. 419 (1995).

56.     Notably, *Kyles v. Whitley* involved OPDA and the same type of *Brady* violation that occurred in Mr. Reeder's case: suppression of a witness's prior inconsistent statements made to prosecutors. The Supreme Court handed down its opinion in *Kyles v. Whitley* less than three months before Mr. Reeder's second trial.

**Kuantay Reeder's Eventual Discovery of Withheld *Brady* Materials**

57.     Following the affirmance of his conviction on direct appeal, Kuanatay Reeder continued to challenge the validity of his conviction through post-conviction relief.

58.     In December of 2009, successor counsel for Mr. Reeder filed a second application of post-conviction relief in Louisiana State court after discovering that Earl Price had a prior conviction for lying on a federal firearms application that OPDA withheld from Mr. Reeder.

59.     In 2021, following extensive litigation on this *Brady* issue, OPDA's Appeals Division referred Mr. Reeder's case to OPDA's Civil Rights Division – a newly created division that "seeks to redress past harms and injustice the office has caused by identifying…cases involving State misconduct, wrongful convictions, and extreme sentences."

60.     The Civil Rights Division's subsequent review of the prosecution's original file revealed the existence of "significant exculpatory evidence that had never in 25 years been disclosed to defense counsel." In June of 2021, the Civil Rights Division disclosed this previously withheld information to Mr. Reeder's attorney.

61.     This information showed that, for decades, OPDA concealed the existence of exculpatory and otherwise favorable information from Mr. Reeder, his attorneys, and the various courts that presided over Mr. Reeder's case.

62.     This previously withheld information – along with newly discovered information – showed that Mr. Reeder was, and is, innocent of the murder for which he was wrongfully convicted at trial in 1995.

*Earl Price's statements: he identified the alternate suspect as the shooter*

63.     During its review of the original OPDA file, the Civil Rights Division discovered

        two sets of handwritten notes, detailing that on two separate occasions Earl Price

        "notified prosecutors that he identified in the photo lineup the *other* suspect for this

        murder, not the defendant."

64.     OPDA prosecutors' notes reflect that during an interview with prosecutors on

        October 19, 1993, Earl Price stated he identified photograph #5 as Broxton's shooter.

        Photograph #5 was a picture of Berzeracque "Byrd" Johnson, the alternate suspect.

65.     OPDA prosecutors later interviewed Earl Price on December 22, 1993. Again,

        when discussing the photographic lineup, the prosecutor noted that "Price says he

        picked #5 – that would be Bezarque (sic) Johnson." The prosecutor further noted,

        "Price is adamant that he picked #5 [Berzeracque Johnson] and not #6 [Kuantay

        Reeder]." Additionally, Price indicated the "Detective was typing" when Price made

        his identification.

66.     As detailed above, prior to his trial, Mr. Reeder requested that OPDA disclose any

        information contained within the DA's files that would be favorable or exculpatory in

        any manner, pursuant to OPDA's *Brady* obligations; and to disclose any evidence that

        would rebut or discredit the prosecution's evidence.

67.     At no time prior to, or during trial did OPDA disclose to Mr. Reeder, his counsel,

        or to the jury that Earl Price had – on two separate occasions – informed OPDA that

        he identified the alternate suspect, Berzeracque "Byrd" Johnson as the shooter, not

        Mr. Reeder.

68.     To the contrary, OPDA knowingly misled the jury by portraying Earl Price as unwavering in his identification of Mr. Reeder as the shooter.

69.     During its direct examination of Detective Morris, OPDA asked "[a]nd in showing that lineup to Mr. Price, did Mr. Price hesitate, say it could be 5 or 6 – or in any way indicate to you that No. 5 was a possible suspect in the murder?" Answering from his own perspective, the detective responded: "No sir."

70.     Later, on re-direct, OPDA again asked Detective Morris, "[a]nd did either of those individuals ever identify Berserack [sic] Johnson as the person who killed Mark Broxton?" Again, answering from his own perspective, the detective answered, "No."

71.     These questions were materially misleading, in that the ADA knew that Earl Price had, in fact, claimed he identified Berzeracque "Byrd" Johnson's as the murderer – but Price asserted this fact to the ADA not Detective Morris.   OPDA's Civil Rights Division later acknowledged that "the prosecutor's questions about Mr. Price's identification were materially misleading" because "the prosecutors knew that the witness had actually said he identified the alternate suspect."

72.     ADA Michael Daniels further misled the jury by making the following assertion during his closing argument: "have they [defense] brought you any witnesses -- have we brought you any witnesses who identified anyone other than Kuantau (sic) Reeder as the man who killed Mark Broxton? No witness who has personal knowledge of what happened has ever said anything other than Kauntau [sic] Reeder's the man guilty of Mark Broxton's death."

73.     That Earl Price, twice, insisted to prosecutors that he had chosen the alternate suspect as the shooter constituted exculpatory and otherwise favorable information

that was material to the defense. OPDA was obligated to disclose this information to Mr. Reeder and OPDA's failure to do so undermines confidence in the jury's verdict.

74. Notably, the OPDA's Civil Rights Division subsequently filed Stipulations in Response to Reeder's Application for Post-Conviction Relief, stipulating that this "crucial impeachment evidence" regarding the prosecution's "sole testifying eyewitness" constituted "quintessential *Brady* impeachment evidence" and that OPDA's "failure to disclose the contradictory statements Mr. Price made...constitute[d] a violation of its *Brady* obligation."

75. In its Stipulations, OPDA further acknowledged that the unconstitutionally withheld information would have been significant to Mr. Reeder's defense, and OPDA's failure to produce such evidence undermined confidence in the verdict:

> Put most simply and clearly, the State had an obligation to disclose the sole testifying eyewitness's repeated insistence that he identified the alternate suspect's photo in the lineup in this case. Had that information been turned over, there is a reasonable probability that the outcome of the trial would have been different—even without the other nondisclosures. The jury, which was already not unanimous, may have had serious and legitimate reasons to question whether Mr. Reeder participated in this crime. The State's failure to provide favorable evidence to the defense renders the verdict unworthy of confidence and, therefore, Mr. Reeder's conviction and incarceration violate the Constitution.

76. On December 6, 2021, the Criminal District Court for the Parish of Orleans ruled that the legal threshold had been met under *Brady v. Maryland*. In so doing, the District Court found that information pertaining to Earl Price's potentially identifying the other suspect constituted "exculpatory information" that was "significant" and that OPDA should have turned over to the defense for the defense to use during trial.

77.     On December 6, 2021, the Criminal District Court determined that, based on OPDA violating its *Brady* obligations and consequently, Mr. Reeder's constitutional rights, as described in paragraphs 63 through and including 72 above, Mr. Reeder's conviction had to be vacated.

**OPDA's Additional *Brady* Violations**

78.     While the Criminal District Court based its ruling on the violation set forth above, OPDA violated Mr. Reeder's constitutional right to the disclosure of favorable information in several additional ways.

*Earl Price's statement: he had never seen Kuantay Reeder before*

79.     An independent review of portions of the prosecution's original file has revealed that OPDA also withheld information that Earl Price told prosecutors he had never seen Kuantay Reeder before the day of the shooting.

80.     During Earl Price's initial interview with OPDA's prosecutors on October 19, 1993, the prosecutor's handwritten notes indicate that, when questioned about Kuantay Reed, Earl Price told the prosecutor that he "[d]id't know him" and that he "[n]ever saw him before." The contents of Earl Price's statement were memorialized on the prosecutor's handwritten notes.

81.     Prior to his trial, Mr. Reeder requested that OPDA disclose any information contained within the DA's files that would be favorable or exculpatory in any manner, pursuant to the prosecutors' *Brady* obligations; and to disclose any evidence that would rebut or discredit evidence the prosecution intended to use.

82.    Notwithstanding these requests, at no time prior to, or during trial did OPDA

disclose to Mr. Reeder, his counsel, or to the jury that Earl Price initially informed

OPDA that had never seen the Kuantay Reeder before the shooting.

83.    To the contrary, OPDA relied on Earl Price's testimony that, prior to the shooting,

he had seen Reeder at the Fisher Housing Development to bolster the accuracy of

Price's identification.

84.    During the prosecution's closing arguments, ADA Byron Berry asserted: "On that

day [Earl Price] did not know Kuantau Reeder's name. But he knew who Kuantau

Reeder was. Because he had seen him on numerous occasions – on numerous

occasions. And he recognized him. And he saw Kuantau Reeder brutally shoot down

Mark Broxton and take his life."

85.    And again, during rebuttal closing argument, ADA Michael Daniels relied on

Price's testimony that he had seen Reeder before as a means to both (1) bolster the

accuracy of Price's identification, and (2) minimize the fact that Price's physical

description was a closer match to the alternate suspect – Byrd Johnson –than it was to

Mr. Reeder:

> "And I talked to you about recognition; that it's tough to be able to
> describe people. That's why at Pontchartrain Beach and at amusement
> parks they give prizes if the guy can't guess your weight or guess how
> old you are. But it's really tough to do. But it's easy to recognize
> somebody you know. And Earl Price told you that he recognized
> Kuantau Reeder from around the Fischer Housing Development. He
> had seen him before."

86.    The fact that Earl Price had previously informed prosecutors that he had never

seen Kuantay Reeder before the day of the shooting constituted exculpatory and

otherwise favorable information that was material to the defense. OPDA was obligated to disclose this information to Mr. Reeder and OPDA's failure to do so undermines confidence in the jury's verdict.

*Earl Price's undisclosed prior conviction for lying on a firearms application*

87.     In the fall of 2009, successor counsel for Mr. Reeder discovered that OPDA withheld information that Earl Price had a prior conviction for lying on a federal application, as well as a prior conviction for being a convicted felon in possession of a firearm.

88.     Prior to trial, Mr. Reeder's counsel had filed a request for all *Brady* materials pertaining to the complete criminal history of the prosecution's witnesses – including both arrests and convictions.

89.     At no time prior to, or during trial did OPDA disclose to Mr. Reeder, his counsel, or to the jury that Earl Price had a prior conviction for lying on a federal firearm application, and a prior conviction for being a convicted felon in possession of a firearm.

90.     To the contrary, OPDA allowed Earl Price to commit perjury when he testified that he had only served a jail sentence for an assault and battery conviction in Mississippi, and denied both ever being in jail for any other crime, and ever being convicted of any other crime. Despite knowing these statements to be false, prosecutors allowed the false evidence to go entirely uncorrected, plainly contravening the dictates of *Napue v. Illinois*, 360 U.S. 264 (1958).

91.     Moreover, during closing arguments, ADA Michael Daniels relied on this false testimony to bolster the credibility of the prosecution's sole testifying eyewitness:

"you will find that Earl Price, with everything you know, is a credible witness. He's not perfect – when asked about his prior convictions, he admitted 'em right away. Not a hesitation, not a lie; admitted them right away."

92.     That Earl Price had previously been convicted two federal felonies – one of which involved lying – constituted favorable information that was material to the defense. OPDA was obligated to disclose this information to Mr. Reeder and OPDA's failure to do so undermines confidence in the jury's verdict.

*Evidence that – Berzeracque "Byrd" Johnson – committed the murder*

93.     During its review of the original OPDA file, the Civil Rights Division discovered handwritten notes from the ADA's interview with Mary Menina, Mark Broxton's mother. According to the notes, Ms. Menina informed prosecutors that "her 1st thought was Byrd was the murderer." In giving the numerous bases for this initial opinion, Ms. Menina explained that "Byrd knew her phone #" and that the night of Mark's murder, someone left a message on her machine, stating "Tonite [sic] I killed that dog."

94.     Prior to his trial, Mr. Reeder requested that OPDA disclose any information contained within the DA's files that would be favorable or exculpatory in any manner, pursuant to the State's *Brady* obligations; and to disclose any evidence that would rebut or discredit evidence the prosecution intended to use.

95.     However, at no time prior to, or during trial did OPDA disclose to Mr. Reeder, his counsel, or to the jury that Ms. Menina initially thought that Berzeracque "Byrd" Johnson – the alternate suspect – was the murderer. And, while OPDA did disclose the existence of the message on Ms. Menina's answering machine, upon information

23

and belief, at no time prior to, or during trial did OPDA disclose that Johnson actually knew Ms. Menina's phone number.

96.     That Ms. Menina informed prosecutors she initially believed Johnson was the murderer, in part, because he knew her phone number and could have left the message on her machine stating "tonight I killed that dog" constituted exculpatory and favorable evidence, that would have been material to Mr. Reeder's defense. OPDA was obligated to disclose this information to Mr. Reeder, and OPDA's failure to do so undermines confidence in the jury's verdict.

**Criminal District Court Vacates Kuantay Reeder's Conviction**

97.     Following OPDA's Civil Rights Division's disclosure of "never-previously-disclosed exculpatory evidence", Mr. Reeder filed a Second Supplement to his Second Application for Post-Conviction Relief on August 2, 2021 in Criminal District Court.

98.     On November 18, 2021, OPDA filed "Stipulations in Response," acknowledging that (1) OPDA had an obligation to disclose Earl Price's "repeated insistence that he identified the alternate suspect's photo in the lineup," (2) "[h]ad that information been turned over, there is a reasonably probability that the outcome of the trial would have been different", (3) OPDA's failure to provide this "favorable evidence to the defense renders the verdict unworthy of confidence," and (4) "Mr. Reeder's conviction and incarceration violate the Constitution."

99.     On December 6, 2021, the Criminal District Court found that "the threshold has been met under *Brady versus Maryland*" and accordingly vacated Mr. Reeder's

conviction for second-degree murder. OPDA immediately dropped the charges against Mr. Reeder and the Criminal District Court ordered his release from prison.

100.   On December 6, 2021, Mr. Reeder walked out of Angola Penitentiary after spending over twenty-eight (28) years in prison for a crime he did not commit, solely because of OPDA's violation of his right to material, favorable information.

**OPDA's Longstanding Policy and Custom of Violating the Constitutional Rights of Defendants by not Disclosing Material, Favorable Information to Them**

101.   OPDA's repeated violation of Mr. Reeder's constitutional right to the disclosure of favorable evidence was not an isolated event. To the contrary, it was part of a longstanding pattern of similar violations by OPDA that started years before Mr. Reeder's trial and continued for many years after.

102.   OPDA has maintained and carried out an unconstitutional policy, custom, and practice of violating the constitutional rights of defendants charged with crimes by failing to disclose to them information that is favorable to the defendants.

103.   Under *Brady*, prosecutors violate a defendant's constitutional due process rights by withholding or failing to disclose evidence that is "favorable to the defense and material to the defendant's guilt or punishment." Evidence is "material" when there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." The Supreme Court has made clear that the *Brady* obligation includes both impeachment evidence and exculpatory evidence. A prosecutor also has an obligation "to learn of any favorable evidence known to the others acting on the government's behalf . . . including the police," and

that the materiality inquiry "turns on the cumulative effect of all such evidence suppressed by the government."

104.    In 2017, the Louisiana Court of Appeal, Fourth Circuit noted "the storied, shameful history of the local prosecuting authorities' noncompliance" with its duty to disclose to defendants information that is favorable to them.

105.    Indeed, OPDA's Civil Rights Division has acknowledged that, during the timeframe of Mr. Reeder's prosecution, OPDA "did not disclose handwritten notes taken by prosecutors during witness interview" as "a matter of practice."

106.    As a result of this unconstitutional policy or custom, OPDA has engaged in the wrongful prosecution of innocent persons and, upon information and belief, has failed in many such instances to prosecute the real perpetrators.

*Unconstitutional Written Policy*

107.    In 1987 Harry Connick – the then-head of OPDA and its official policymaker – officially adopted or promulgated a "Policy Manual" for OPDA. In a letter included in the manual Connick stated that "we have developed a policy manual outlining the duties and responsibilities of those who work" at OPDA.

108.    At all times relevant, District Attorney Harry Connick was acting as an independent local official policymaker in establishing OPDA's internal policies and training regarding prosecutors' acquisition of, security of, and disclosure of *Brady* materials.

109.    The manual, which upon information and belief, remained in force during the period of Mr. Reeder's trial, included a policy regarding the disclosure of favorable information to defendants that provided in pertinent part: "In most cases, in response

26

to the request of defense attorneys, the Judge orders the State to produce so-called *Brady* material – that is, information in the possession of the State which is exculpatory regarding the defendant."

110.    Furthermore, Connick previously testified that *Brady* only requires production of evidence that "exculpates the accused," as opposed to evidence merely "favorable" to the defense. And according to Connick, there could be no *Brady* violation arising out of "inadvertent conduct of [an] assistant under pressure with a lot of case load."

111.    This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it suggested that OPDA prosecutors were obligated to disclose favorable information to a defendant <u>only</u> if the defendant's attorney requested such disclosure when, in truth and in fact, that obligation existed regardless of whether or not the defendant's attorney made such a request.

112.    This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it suggested that OPDA prosecutors were obligated to disclose favorable information to a defendant only if a judge ordered them to do so, when, in truth and in fact, that obligation existed regardless of whether or not the judge ordered disclosure. Indeed, in a much later argument before the United States Supreme Court, the head of OPDA's Appeals Section conceded that relying upon a judge to determine whether or not OPDA was required to disclose information to a defendant pursuant to *Brady* was a "poor practice."

113.    This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it required OPDA prosecutors to disclose only "exculpatory" information when, in truth and in fact, OPDA was also required to

disclose information that could be used to impeach the trial testimony of OPDA witnesses or was otherwise favorable to the defendant, even if it did not directly exculpate the defendant.

114.    This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it did not require OPDA prosecutors to disclose information that was not initially in OPDA's possession but was only in the possession of the NOPD when, in truth and in fact, OPDA was required to disclose such information.

115.    This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it suggested that OPDA's obligation to disclose favorable information to a defendant charged with a crime applied only in most, but not all, cases.

116.    This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it did not expressly require OPDA prosecutors to disclose information that was favorable to the defendant even if that information was not documented.

117.    Additionally, OPDA – under Connick's leadership – exacerbated the unconstitutional policy by imposing severe penalties for ADA's who provided evidence that did not qualify as *Brady* information under Connick's erroneously restrictive interpretation.

*Unconstitutional Unwritten Policy or Custom*

118.    OPDA has maintained and carried out, for many years, an unwritten policy or custom of not disclosing favorable information to defendants charged with crimes.

*OPDA's Numerous Brady Violations Indicating an Unwritten Policy or Custom*

119.    The existence of this unwritten policy or custom is supported by publicly available information in cases in which a court has determined, or OPDA has acknowledged, that OPDA failed to disclose favorable information to a defendant charged with a crime. Based solely on that publicly available information, OPDA has failed to make such disclosures in at least 46 cases, not including Mr. Reeder's case.

120.    Of these 46 cases, 34 occurred prior to Mr. Reeder's trial.

121.    Of these 46 cases, at least 27 involved OPDA's failure to disclose a statement that an OPDA witness made prior to trial that was inconsistent with the witness's trial testimony – the same type of constitutional violation that occurred in Mr. Reeder's case. Of these 27 cases, 22 of them occurred prior to Mr. Reeder's trial.

122.    Of these 46 cases, at least nine resulted in reversals of convictions by the United States Supreme Court; the United States Court of Appeals for the Fifth Circuit; or the Louisiana Supreme Court, the state's highest court, on the basis of *Brady* violations prior to Mr. Reeder's trial. *See Kyles v. Whitley* 514 U.S. 419 (1995); *Monroe v. Blackburn*, 607 F. 2d 148 (1979); *Davis v. Heyd*, 479 F. 2d 446 (5th Cir. 1973); *State v. Knapper*, 579 So. 2d 956 (La. 1991); *State v. Rosiere*, 488 So. 2d 965 (La. 1986); *State v. Perkins*, 423 So. 2d 1103 (La. 1982); *State v. Curtis*, 384 So. 2d 396 (La. 1980); *State v. Falkins*, 356 So. 2d 1 (LL.1978); *State v. Casey*, 3So 415 ((LLa. 1197). Of these nine cases, six involved OPDA's failure to disclose a statement that an OPDA witness made prior to trial that was inconsistent with the witness's trial testimony – the same type of constitutional violation that occurred in Mr. Reeder's case.

123.   The above-described instances in which OPDA failed to disclose favorable information to the defendants it prosecuted significantly understates the actual number of times that OPDA has violated the constitutional rights of defendants in this way. Unlike other types of constitutional violations, where the defendant is presumably well aware of the potential or actual violation – for example, the use of excessive force or a violation of the defendant's right to a speedy trial – a violation of a defendant's right to the disclosure of favorable information is inherently difficult to detect because it inherently involves the suppression of information.

124.   This phenomenon has been widely recognized by leading members of the legal profession. For example, United States Supreme Court Justice Ruth Bader Ginsberg has stated that *Brady* violations "are not easily detected" and are frequently the result of a "chance discovery." And former United States Supreme Court Justice Byron White has stated that the "judicial process will by definition be ignorant of" a violation involving suppressing evidence when it occurs, and that "it is reasonable to suspect that most violations never surface."

125.   Another reason why the above-described instances in which OPDA failed to disclose favorable information to the defendants it prosecuted significantly understates the actual number of times that OPDA has violated the constitutional rights of defendants in this way is that, upon information and belief, the vast majority of cases filed by OPDA have resulted in a guilty plea and no trial. In these cases, it is likely that the pleas occurred prior to the time that the defendants would have uncovered any *Brady* material. In these cases, it is also far less likely that the defendants, having entered a guilty plea and having provided a factual predicate for

their pleas, would pursue a post-conviction challenge to their conviction. Since post-conviction litigation is the procedural stage at which many *Brady* violations are uncovered, the substantial prevalence of guilty pleas among OPDA cases dramatically reduces the likelihood of *Brady* violations being detected at anything close to the rate at which they actually occur.

126.   Another reason why the above-described instances in which OPDA failed to disclose favorable information to the defendants it prosecuted significantly understates the actual number of times that OPDA has violated the constitutional rights of defendants in this way is that, upon information and belief, there have been cases in which a court determined that OPDA violated *Brady* but the decision was not publicly reported. Connick has testified that this in fact has occurred. In such cases, it is difficult if not impossible for persons such as Mr. Reeder to identify the cases in which failures to disclose favorable information occurred.

127.   Another reason why the above-described instances in which OPDA failed to disclose favorable information to the defendants it prosecuted significantly understates the actual number of times that OPDA has violated the constitutional rights of defendants in this way is that, upon information and belief, there have been cases with *Brady* violations in which courts granted relief on other grounds.

128.   Another reason why the above-described instances in which OPDA failed to disclose favorable information to the defendants it prosecuted significantly understates the actual number of times that OPDA has violated the constitutional rights of defendants in this way is that many of OPDA's files from the Connick-era have been destroyed by flooding, hurricane, or by court order. A representative from

OPDA's Civil Rights Division has acknowledged the practical impossibility of assessing the validity of complaints concerning prosecutorial misconduct "if the records aren't there."

*Additional Court Decisions Establishing OPDA's Policy or Custom of Violating Brady*

129.    In addition to the cases described above, in at least four cases that were decided prior to Mr. Reeder's trial, the Louisiana Supreme Court ruled that a prosecutor from another Louisiana district attorney's office failed to disclose favorable information to a defendant charged with a crime. These cases provide further support for the conclusion that OPDA was well aware of its constitutional obligation to disclose favorable information to the defendants it prosecuted, and yet repeatedly violated that obligation.

130.    OPDA's persistent failure to honor its *Brady* obligations is remarkable, especially in light of the fact that several of the United States Supreme Court's leading decisions in this area of the law involved OPDA itself. For example, as noted above, in April of 1995 – less than three months before Mr. Reeder's second trial – the United States Supreme Court decided *Kyles v. Whitley*. In that case, the United States Supreme Court held that OPDA violated the defendant's rights under *Brady* by failing to disclose information obtained by OPDA during witness interviews that the defendant could have used to impeach the credibility of witnesses who testified at trial – the same type of *Brady* violation that occurred in Mr. Reeder's case.

131.    That OPDA's violations of defendants' *Brady* rights continued even after the *Kyles* decision supports the conclusion that the continued violations were the result of OPDA's unwritten policy or custom of not complying with its *Brady* obligations

132.    OPDA's description of, and reaction to, the *Kyles* decision provides further support for that conclusion. Connick, the head of OPDA at the time of the decision has testified, incorrectly, that *Kyles* "wasn't a *Brady* case." He also testified that he did not recall that the United States Supreme Court ruled in *Kyles* that the defendant's claim – that OPDA violated its *Brady* obligations – was valid. He also testified that he saw no need to change OPDA's *Brady* policy after the *Kyles* decision. He also testified that compliance with the *Kyles* decision was "not realistic," stating, "insofar as what was in the police file, who the hell knows[.]" And he also has suggested that he disagreed with the *Kyles* decision, stating that "[j]ust because a guy puts on a black robe doesn't mean he is right." This testimony by the longtime Orleans Parish District Attorney, reflects OPDA's disdain for and disregard of the United States Supreme Court's decision in *Kyles* and, in turn, OPDA's obligations under *Brady*.

133.    Connick's disdain for the United States Supreme Court's decision in *Kyles* was not lost on members of his office. In the re-trial of the defendant in *Kyles*, the OPDA prosecutor stated in court that the Court's decision in *Kyles* was wrong.

134.    Despite OPDA's string of *Brady* violations prior to and including *Kyles*, OPDA failed to take adequate measures to prevent future violations. It did not revise its written *Brady* policy. It did not conduct adequate training for OPDA prosecutors on their *Brady* obligations. And it did not take disciplinary action against OPDA prosecutors who violated *Brady*.

135.    All of these statements, actions, and failures to act in the wake of *Kyles* reflect OPDA's disdain and disregard for its obligations under *Brady*, consistent with its unwritten policy or custom of not complying with those obligations.

*Statements by OPDA Heads and Prosecutors Establishing OPDA's Policy or Custom of Violating Brady*

136.    OPDA's longstanding policy or custom of disregarding its *Brady* obligations is further evidenced by the sworn testimony and admissions of former OPDA prosecutors, Connick, and heads of OPDA who succeeded Connick.

137.    Connick, the head of OPDA at the time of Mr. Reeder's trial, has testified that he was unaware that OPDA's *Brady* obligations required it to disclose all information favorable to the defendant, and not just information that demonstrated that the defendant is not guilty of the crime with which he is charged. This testimony reflects both a misunderstanding of OPDA's *Brady* obligations as well as the inadequacy and unconstitutional nature of OPDA's *Brady* policy. As the United States Supreme Court has stated, a *Brady* violation occurs when the prosecution fails to disclose favorable information to the defendant, regardless of whether the information is directly exculpatory.

138.    Connick has also testified that a prosecutor's failure to disclose favorable information to a defendant due to the prosecutor being under pressure with a large case load would not have constituted a violation of OPDA's *Brady* policy. This testimony reflects both a misunderstanding of OPDA's *Brady* obligations as well as the inadequacy and unconstitutional nature of OPDA's *Brady* policy.  A *Brady* violation occurs whenever the prosecution fails to disclose material, favorable information to the defendant, regardless of the intent of the prosecutor or the reasons for the failure.

139.    Connick also has testified that his "evaluation" of *Brady* was "poor." This

testimony reflects OPDA's disdain and disregard for its obligations under *Brady*,

consistent with its unwritten policy or custom of not complying with those

obligations.

140.    Eddie Jordan, the former head of OPDA, has stated that "the previous

administration [when Connick was the head of OPDA] had a policy of keeping away

as much information as possible from the defense attorney." This statement is

consistent with OPDA having an unwritten policy or custom of not complying with

its *Brady* obligations.

141.    Cannizzaro, another former head of OPDA.  has stated that "[i]n the decades

preceding my administration, the District Attorney's office [under Connick] had been

in a steady state of decline. Over the course of that time period, bad policy decisions

took root and became institutional." In an evident reference to OPDA's repeated

violations of its *Brady* obligations, Cannizzaro stated that "some of those policy

decisions had collateral consequences in the form of civil liability against the office."

This statement is consistent with OPDA having an unwritten policy or custom of not

complying with its *Brady* obligations.

142.    OPDA's unwritten policy or custom of not disclosing favorable information to

defendants charged with crimes included the post-trial phases of criminal cases. A

former OPDA prosecutor has testified that, when a defendant asserted a *Brady* claim

after the defendant was convicted, there was no policy requiring the prosecutor to

obtain and review the trial file or to communicate with the prosecutor who tried the

case so that OPDA could determine whether the defendant's claim was valid. This

statement is consistent with OPDA having an unwritten policy or custom of not complying with its *Brady* obligations.

*Additional Evidence Establishing OPDA's Policy or Custom of Violating* Brady

143.    Then-Orleans Parish Criminal District Court Judge Calvin Johnson wrote to Connick in 1998 to advise him that OPDA prosecutors were failing to comply with OPDA's *Brady* obligations. Connick ignored the warning and maintained OPDA's policy or custom of disregarding its *Brady* obligations.

144.    A 2012 study of OPDA concluded that, despite its lengthy history of repeated violations of its *Brady* obligations, OPDA continued to fail to institute changes to its policies and customs sufficient to encourage consistent compliance with *Brady*. This study is consistent with OPDA having an unwritten policy or custom of not complying with its *Brady* obligations.

145.    A 2012 study of exonerations in the United States from 1989 to 2012 concluded that New Orleans (Orleans Parish) had the most exonerations per capita of any county with a population over 300,000, at a rate of more than 13 times the national average. Nearly all of the exonerations in New Orleans involved *Brady* violations committed by OPDA. This study is consistent with OPDA having an unwritten policy or custom of not complying with its *Brady* obligations.

146.    A 2017 study analyzing state appellate court opinions that were issued from 2010 through 2015 and concern prosecutorial misconduct — including *Brady* violations — found that Orleans Parish had the highest per capita rate of cases involving misconduct as well as the largest number of reversals of any parish in Louisiana. In reporting these findings, the study stated that OPDA "has long been a hotbed for

prosecutorial misconduct." This study is consistent with OPDA having an unwritten policy or custom of not complying with its *Brady* obligations.

*Failure to Train and Supervise*

147.   OPDA's policy or custom of violating the constitutional rights of defendants charged with crimes by failing to disclose to them information favorable to them is also demonstrated by its failure to properly and adequately train and supervise OPDA prosecutors with respect to their *Brady* obligations.

148.   OPDA's failure to properly and adequately train and supervise OPDA prosecutors with respect to their *Brady* obligations is reflected in many different ways.

149.   As described in paragraphs 107 through and including 116 above, OPDA's written *Brady* policy, as reflected in OPDA's training manual, inaccurately described OPDA's *Brady* obligations in several different ways.

150.   Several former OPDA prosecutors have testified that they did not recall receiving any training on *Brady* at OPDA.

151.   OPDA failed to properly and adequately train and supervise OPDA prosecutors with respect to their obligation to disclose information, favorable to the defendant, that was learned during OPDA's interviews with prosecutors.

152.   Indeed, following the aforementioned capital case *Kyles v. Whitley*, 514 U.S. 419 (1995), in which the Supreme Court reversed based on OPDA's failure to disclose information obtained by OPDA during witness interviews that the defendant could have used to impeach the credibility of witnesses who testified at trial, Connick stated he was satisfied with OPDA's policies and practices and saw no need for any changes.

153.    Connick's failure to institute policy changes or additional training, despite being on notice that the existing policies and practices were resulting in the violation of defendants' constitutional rights to receive favorable, material information amounts to – at the very least – a deliberate indifference to the defendants' *Brady* rights. Connick was on notice that, without additional training or policy changes, it was highly predictable that OPDA's prosecutors would continue to make incorrect *Brady* decisions.

154.    OPDA also failed to utilize checklists, audits, reviews, or coordinators to ensure that its prosecutors complied with OPDA's *Brady* obligations.

155.    OPDA also failed to discipline OPDA prosecutors who violated OPDA's *Brady* obligations.

156.    For example, Connick has testified that OPDA failed to discipline OPDA prosecutors who violated OPDA's *Brady* obligations because it would make his job more difficult.

157.    As a result of OPDA's failure to discipline OPDA prosecutors who violated OPDA's *Brady* obligations, OPDA prosecutors had little or no reason to be concerned about the consequences if they violated those obligations.

158.    OPDA and the heads of OPDA were aware or should have been aware that OPDA prosecutors had repeatedly violated OPDA's *Brady* obligations and that there was a need to train and supervise prosecutors in order to prevent future, similar violations. OPDA's failure to train or supervise its prosecutors amounted to deliberate indifference to defendants' constitutional rights under *Brady*.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION – 42 U.S.C. § 1983**
**(Defendant Jason Williams)**

159.    Paragraphs 1 through and including 158 are repeated and re-alleged as if fully set forth herein.

160.    OPDA, acting under color of law, withheld from Mr. Reeder favorable evidence relating to the murder of Mark Broxton that was material to Mr. Reeder's guilt or innocence, in violation of Mr. Reeder's right to due process and a fair trial under the Fifth, Sixth,  and Fourteenth Amendments to the United States Constitution; Articles 1.2, 1.5, and 1.16 of the Louisiana Constitution; and 42 U.S.C. § 1983.

161.    At all times relevant to this action, OPDA maintained an unconstitutional written policy, officially adopted and promulgated by OPDA and the heads of OPDA, with respect to OPDA's obligation to disclose favorable information to the defendants it prosecuted.

162.    At all times relevant to this action, OPDA failed to provide adequate training or supervision of OPDA prosecutors with respect to OPDA's obligation to disclose favorable information to the defendants it prosecuted, despite OPDA's awareness of many prior instances in which it violated *Brady* — including in its prosecution of Curtis Lee Kyles, whose conviction was vacated by the United States Supreme Court in *Kyles v. Whitley* less than three months before Mr. Reeder's trial — and despite the fact that it was obvious that such training and supervision was required in order to prevent other *Brady* violations. This failure to train and supervise was sufficiently common and well-settled that it constituted a custom that fairly represented OPDA's

official policy of not complying with its obligation to disclose favorable information to the defendants it prosecuted.

163.    At all times relevant to this action, OPDA's persistent and widespread custom, reflected in numerous cases, of failing to disclose favorable information to the defendants it prosecuted; its failure to adequately train and supervise OPDA prosecutors with respect to OPDA's *Brady* obligations; and other statements, actions, and omissions reflecting OPDA's failure to comply with or otherwise take seriously its *Brady* obligations, were, when taken as a whole, sufficiently common and well-settled that they constituted a custom that fairly represented OPDA's official policy of not complying with its obligation to disclose favorable information to the defendants it prosecuted.

164.    OPDA and the heads of OPDA were on actual or constructive notice that the above-described official policies and customs failed to protect the right of Mr. Reeder and other defendants like him under the Unites States Constitution to the disclosure of favorable information, but were deliberately indifferent to the known and/or obvious consequence that constitutional violations would result from these official policies and customs.

165.    The policies and customs set forth above were the moving force that caused the deprivation of Mr. Reeder's right under the United States Constitution to the disclosure of favorable information that was material to Mr. Reeder's guilt or innocence.

166.    The conduct set forth above was the cause in fact and proximate cause of Mr. Reeder's injuries and damages, as described in paragraph 6 above.

167.    Defendant Williams, as the representative of OPDA, is liable to Mr. Reeder pursuant to 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION — LOUISIANA REVISED STATUTE § 22:1269

### (Defendants ABC Insurance Companies 1–10)

168.    Paragraphs 1 through and including 158 are repeated and re-alleged as if fully set forth herein.

169.    Defendants ABC Insurance Companies 1–10 may have issued and currently have in effect one or more policies of insurance covering Defendant Williams and/or OPDA with regard to the actions complained of herein and obligating Defendants ABC Insurance Companies 1–10, jointly and/or severally, to pay on behalf of Defendant Williams and/or OPDA any sums the insureds may become obligated to pay Mr. Reeder or to indemnify Defendant Williams and/or OPDA for any sums the insureds may become obligated to pay Mr. Reeder.

170.    As described above, Defendant Williams, as the representative of OPDA, is liable to Mr. Reeder for all damages sustained by Mr. Reeder, costs and reasonable attorney's fees. Defendants ABC Insurance Companies 1–10 may be contractually obligated to pay all sums on behalf of Defendant Williams and/or OPDA or to indemnify the insureds for these sums.

171.    Defendants ABC Insurance Companies 1–10 may be liable to Mr. Reeder for any and all sums described above up to their policy limits, notwithstanding the fact that Defendant Williams and/or OPDA may themselves be able to assert claims of privilege or immunity from liability.

172.     Pursuant to Louisiana Revised Statute § 22:1269 (B), Mr. Reeder brings a direct action against Defendants ABC Insurance Companies 1–10 to recover any and all sums they are obligated to pay him on behalf of their insureds or for which they are obligated to indemnify their insureds.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Kuantay Reeder requests that this Court enter judgment as follows:

1.  On the First Cause of Action, against Defendant Jason Williams, as the representative of the Orleans Parish District Attorney's Office, compensatory and punitive damages in an amount to be determined at trial; costs; and reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

2.  On the Second Cause of Action, against Defendants ABC Insurance Companies 1-10, an amount equal to any and all sums they are obligated to pay Mr. Reeder on behalf of Defendant Jason Williams and/or the Orleans Parish District Attorney's Office or for which they are obligated to indemnify the insureds; and

3.  On both causes of action, granting Mr. Reeder such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Mr. Reeder demands a trial by jury on both causes of action set forth above.


Dated: November 22, 2022

Respectfully submitted,


*/s/ Kelly Patrick Mitchell* _____
Herbert V. Larson, Jr. (La. Bar No. 8052)
Kelly Patrick Mitchell (La. Bar No. 37807)
LARSON & MITCHELL
ATTORNEYS AT LAW
700 Camp Street
New Orleans, LA 70130
(504) 528-9500
hvl@landmlaw.com
kpm@landmlaw.com

Attorneys for Kuantay Reeder